UNITED STATES DISTRICT COURT
DISTRICT MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CRIMINAL |
| | ) | NO.:  19-10345-DPW |
| | ) | Leave To File |
| ANNE M. LYNCH, | ) | <u>Granted: April 5, 2021</u> |
| Defendant. | ) | |

---

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
ANNE M. LYNCH'S MOTION TO DISMISS OF THE INDICTMENT IN PART

---

Defendant, Anne M. Lynch, (hereinafter "Lynch") by and through undersigned counsel, respectfully submits this memorandum of law in support of her motion to dismiss certain counts and parts of the indictment.

<u>INTRODUCTION</u>

The motion to dismiss seeks a complete dismissal of the count that alleges a conspiracy to commit honest services wire fraud and wire fraud (Count III), a complete dismissal of the count that alleges honest services wire fraud and aiding and abetting (Count IV), a complete dismissal of the count that alleges wire fraud and aiding and abetting (Count V), and a complete dismissal of the two counts that allege wire fraud and aiding and abetting (Counts VI & VII).  The motion to dismiss seeks a partial dismissal of the count in the indictment that alleges Lynch participated in a racketeering conspiracy (Count I)[1], a partial dismissal of the count that alleges Lynch participated in a racketeering enterprise by committing honest services wire fraud, wire fraud,

---

[1] Lynch does not seek dismissal of Count I to the extent it alleges that one of the purposes of the racketeering conspiracy was to obstruct and impede the federal grand jury's investigation.

aiding and abetting honest services wire fraud and commercial bribery (Count II).[2]  The motion to

dismiss does not seek dismissal of the remaining counts in the indictment (Counts VIII – XVIII).

FACTUAL BACKGROUND

Lynch is the former owner of a lobbying firm which, between 2008 and 2016, was

employed by the State Police Association of Massachusetts ("SPAM").  Between 2012 and 2018,

co-defendant Dana A. Pullman ("Pullman') was an employee of the Commonwealth's Department

of State Police and President of SPAM.

A.    Days-Off Loss Settlement.

On or about 2005, SPAM filed a grievance on behalf of its members alleging that the

Massachusetts    State    Police    ("MSP")    and    the    Commonwealth    of    Massachusetts

("Commonwealth") improperly compensated its members for working on scheduled days off lost

(hereinafter "DOLs").  On or about 2012, SPAM hired Lynch's lobbying firm and others to review

the payroll records of SPAM's members to calculate the total amount owed to them for the days-

off they worked and were improperly paid.

On or about July 2013, the Commonwealth and the MSP agreed to a multi-million-dollar

settlement to resolve the grievance.  Specifically, the Commonwealth agreed to pay more than $22

million to settle the DOL grievance and $350,000 to SPAM for expenses SPAM incurred pursuing

the grievance.

After the settlement was finalized SPAM paid Lynch's lobbying firm $250,000.00.

Thereafter, Lynch wrote a check to herself for $50,000.00.  Lynch deposited this $50,000.00 check

into her personal account and, thereafter, wrote a check from her personal account to Pullman's

---

[2] The motion to dismiss does not seek dismissal of Count II in its entirety.  The motion does not seek dismissal
of racketeering act five, which alleges obstruction of justice and aiding and abetting, or racketeering act six, which
alleges obstruction of justice.

spouse for $20,000.00.  This $20,000.00 check subsequently was deposited into Pullman's joint personal bank account with his spouse.  Pullman never disclosed this payment to his wife to SPAM.[3]

B.    <u>Company A Referral</u>.

In 2014, Company A was developing and marketing computer aided dispatch ("CAD") software and a record management system ("RMS").  On April 30, 2014, the Executive Office of Public Safety and Security ("EOPSS"), issued a Request for Response ("RFR") for written proposals for a "CAD/RMS Modernization Solution." On July 25, 2015, an employee of Company A gave Pullman a short demonstration regarding its software.    Lynch did not attend this meeting. Following this presentation, Pullman "encouraged" Employee A to hire Lynch to help Company A submit a response to the RFR.

The next day, Pullman sent Employee A an email informing him that Lynch would be contacting him.  In this email, Pullman represented that Lynch was "a true expert in the state of Mass. Procurement process."  The indictment does not allege that this statement was false.  On August 11, 2014, Lynch attended a meeting with Employee A at SPAM's offices.  Prior to the meeting, on August 7, 2014, Lynch emailed Employee A.  In this email Lynch informed Employee A that she had reviewed the RFR and was prepared to offer some meaningful insights on Company A's RFR submission.

After the meeting on August 11, 2014, Employee A, on behalf of Company A, decided to hire Lynch's lobbying firm.  On or about August 18, 2014, the lobbying firm emailed a $20,000.00

---

[3]Although not stated in the indictment, this $20,000 payment was less than 1% per cent of the $22,350,000.00 DOL settlement.  [$20,000 ÷ $22,350,000.00 x 100 = .08948%] and approximately 5.7% [$20,000 ÷ $350,000 x 100 = 5.71% of the amount paid to Lynch's lobbying firm.  Query whether these *de minimus* amounts gave Pullman or Lynch notice that Pullman or Lynch had a duty to disclose or that the failure to disclose was a federal felony.

invoice to Company A.  On August 20, 2014, the lobbying firm issued a $5,000.00 check to Pullman.  The indictment alleges this payment was "in exchange for Pullman's directing Company A to hire the lobbying firm."  However, this payment was made before Company A paid Lynch's lobbying firm. On September 14, 2014, Company A paid the lobbying firm's $20,000.00 invoice via a wire transfer.

      C.    <u>Company B Referral</u>.

Between April 2015 and February 2016, an employee of Company B ("Employee B") attempted to market and sell smart weapons to the MSP and the Department of Corrections ("DOC").  In April 2015, Employee B attended a meeting with Pullman at SPAM's offices to discuss Company B's sale of its smart weapons to the MSP.  Lynch did not attend this meeting.

During this meeting, Pullman told Employee B that Lynch and her Lobbying Firm could assist Company B in obtaining appropriations from the Massachusetts state legislature to fund the purchase of smart weapons for the MSP.  The indictment does not allege that this statement was false.

The indictment alleges that "based on Pullman's [unspecified] words and actions, Employee B believed that Company B *"would not be able to sell smart weapons to the MSP if it did not hire Lynch and the Lobbying Firm."* (emphasis added).  The indictment does not allege that Pullman had any authority to purchase smart weapons on behalf of the MSP.

Between October 2015 and May 2016, Company B paid the Lobbying Firm a total of $138,000.00 for the lobbying firm's efforts, on behalf of Company B, to lobby the state legislature for an appropriations bill to fund smart weapons for the MSP.  At the same time, Company B was attempting to sell smart weapons to the DOC.  On February 11, 2016, Employee B and a Lobbyist from the lobbying firm met with the Undersecretary of Criminal Justice within EOPSS about the

potential sale of smart weapons to DOC.  The indictment alleges that Pullman played some role in setting up this meeting for Company B because after the meeting a text message was sent to Pullman which stated: "Unbelievable meeting with [the Undersecretary].  Thank you!"

The indictment alleges that on or about February 22, 2016, Lynch paid Pullman $5,000.00 for his "dealings with Company B – including directing Company B to the Lobbying Firm *and* arranging the meeting between Employee B and the Undersecretary." (emphasis added). According to the indictment, Lynch made this payment by writing a check to herself.  Thereafter, Lynch wrote a check to Pullman from her personal account.  The indictment does not allege that Company B's money was used to make this payment.

<u>ARGUMENT</u>

I. <u>LEGAL STANDARD</u>.

An indictment need not say much to satisfy Fed. R. Cr. P. 7(c)(1)'s requirements.  It need only outline the elements of the crime and nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense.  <u>United States v. Guerrier</u>, 669 F.3d 1, 4 (1ˢᵗ Cir. 2011) (quoting <u>Costello v. United States</u>, 350 U.S. 359, 363 (1956).  If those requirements are met, then an indictment, valid on its face, returned by a legally constituted grand jury, calls for a trial on the merits.  <u>United States v. Rodriguez</u>, 738 F.2d 13, 16 (1ˢᵗ Cir. 1984).

When considering a motion to dismiss an indictment, the Court "treats the allegations as true and construes all facts in a light most favorable to the government."  <u>See</u> <u>United States v. Ngige</u>, 780 F.3d 497, 502 (1ˢᵗ Cir. 2015).  "A court should exercise its authority to dismiss cautiously, since to dismiss an indictment 'directly encroaches upon the fundamental role of the

grand jury.'"  United States v. Thomas, 519 F.Supp. 2d 141, 143-44 (D. Me. 2007) (quoting Whitehouse v. U.S. District Court, 53 F.3d 1349, 1360 (1st Cir. 1995).

On the other hand, notwithstanding the sufficiency of the indictment in setting out the elements of a statutory violation, if the government's own facts establish there is no violation, the indictment may be dismissed.  United States v. Huet, 665 F.3d 588, 596-97 (3rd Cir. 2012).

## II.  THE INDICTMENT DOES NOT ALLEGE A COMMERCIAL BRIBERY CRIME UNDER STATE LAW.

Count I, the racketeering conspiracy charge, alleges that Lynch violated Mass. Gen. Laws, c. 271, § 39(a).  Count I further alleges that Lynch attempted to violate § 39(a) pursuant to Mass. Gen. Laws, c. 274, § 6 and conspired to violate § 39(a) pursuant to Mass. Gen. Laws, c. 274, § 7. Count II, the substantive racketeering charge, further alleges that Lynch violated Mass. Gen. Laws, c. 271, § 39(a) in Racketeering Acts One through Three.

Mass. Gen. Laws, c. 271 § 39(a) provides:

> Whoever, in relation to any transaction or matter concerning the business affairs of an employer, principal or beneficiary (1) offers, gives or agrees to give an agent or fiduciary of another person any benefit or anything of value with intent to influence the recipient's conduct, or (2) as an agent or fiduciary, solicits, accepts or agrees to accept any benefit or anything of value from another person who is not an employee, principal, or beneficiary upon an agreement or understanding that such benefit or thing of value will influence his conduct, shall be punished by imprisonment in the state prison for not more than five years, or by a fine of not more than ten thousand dollars, or both.

The current statute was written in 1980.  Even though this law has been on the books for more than 40 years, Massachusetts state courts have only discussed the statute in four appellate decisions, see Commonwealth v. Benoit, 374 Mass. 1 (1964); Mackey v. Rootes Motors, Inc. 348 Mass 464 (1965); Commonwealth v. Kelley, 358 Mass. 43 (1970); N.J. Gendron Lumber Co. v. Great Northern Homes, Inc., 8 Mass. App. Ct. 411 (1979), and only one federal court has weighed

in on the statute.  See Natale v. Espy Corp., 2 F.Supp. 3d 93 (D. Mass. 2014).  However, these

cases make clear that § 39 does not apply to the conduct of a public officer.

In Commonwealth v. Benoit, 347 Mass. 1 (1964), the defendants, who were public

officials, argued that § 39 applied to their conduct.    The Supreme Judicial Court rejected the

defendants' argument.  In doing so, the Court stated unequivocally:

> Contrary to the defendants' present contention, the indictments do not allege acts
> which are offences under G. L. (Ter. Ed.) c. 271, § 39. *That statute relates to acts
> of agents, employees or servants of persons or corporations engaged in private
> business and not to acts of public officers.* This interpretation is confirmed by the
> omission of St. 1962, c. 779, to provide for the repeal of § 39, whereas c. 779
> repealed G. L. c. 268, § 8, which related to public officers and in the language of
> which the indictments were cast. Id. At 5-6. (emphasis added).

St. 1962, c. 779, §1 repealed G. L. c. 268, § 8 and inserted a new G. L. c. 268A, which is entitled

"Conduct of Public Officials and Employees.  Id. at 4.

It is clear that Pullman is a state employee[4] and MSP is a state agency.[5] "Under the maxim

of *expressio unius est exclusio alterius*, there is a presumption 'that when a statute designates

certain persons, things, or manners of operation, all omissions should be understood as

exclusions.'" See Castillo v. Metro. Life, 970 F.3d 1224, 1232 (9th Cir. 2020) quoting Copeland

v. Ryan, 852 F.3d 900, 907 (9th Cir. 2017) (quoting Boudette v. Barnette, 923 F.2d 754, 757 (9th

---

[4] G.L. c. 268A, § 1(q) defines State Employee as:

 [A] person performing services for or holding an office, position, employment, or membership in a
state agency, whether by election, appointment, contract of hire or engagement, whether serving
with or without compensation, on a full, regular, part-time, intermittent or consultant basis,
including members of the general court and executive council.

[5] G.L. c. 268A § 1(p) defines State Agency as:

[A]ny department of state government including the executive, legislative or judicial, and all
councils thereof and thereunder, and any division, board, bureau, commission, institution, tribunal
or other instrumentality within such department, and any independent state authority, district,
commission, instrumentality or agency, but not an agency of a county, city or town.

Cir. 1991)). "The *expressio unius* canon applies when 'circumstances support [] a sensible inference that the term left out must have been meant to be excluded.'" NLRB v. SW Gen., Inc., 137 S. Ct. 929, 940 (2017) (alteration in original) (quoting Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 81 (2002)).

The circumstances in this case support the inference that § 39 does not apply to the public officers. When the General Court repealed former Chapter 268, and enacted Chapter 268A, the General Court could have made § 39 applicable to public officials. It did not. Again, when the General Court rewrote § 39 in 1980, long after the Court's Benoit decision, the General Court could have made § 39 applicable to public officials. It did not. Thus, under the maxim of *expressio unius est exclusio alterius,* it is clear that § 39 was not intended to apply to Pullman's conduct.

Moreover, although Lynch and her Lobbying firm are private actors, the statute requires both the giver and recipient of an alleged commercial bribe to be private parties. Because Pullman is public officer and § 39 does not apply to public officers, the statute does not, as a matter of law, apply to Lynch's conduct. Benoit supra at 4. Accordingly, any and all references to § 39 should be stricken from the indictment. Compare, Commonwealth v. Kelley, 358 Mass. 43, 49 (1970) (the facts alleged in the indictment "would constitute a crime under G. L. c. 271, Section 39 if [co-conspirator] was not then an executive officer of the Commonwealth"); accord, N. J. Gendron Lumber Co. v. Great Northern Homes, Inc., 8 Mass. App. Ct. 411, 415 (1979).

### III. THE INDICTMENT DOES NOT ALLEGE AN HONEST SERVICES WIRE FRAUD CRIME.

Count I (racketeering conspiracy), Count II (racketeering), Counts III (conspiracy to commit honest services fraud) and Count IV (honest services fraud) all allege that Lynch either conspired to commit honest services wire fraud or committed honest services wire fraud.[6] Because

---

[6] In order for a defendant in Lynch's position to be found guilty of honest services wire fraud, the government

the indictment does not allege an honest services wire fraud crime, all references to honest services fraud contained in the indictment should be stricken.

In McNally v. United States, 483 U.S. 350 (1987) the Supreme Court held that the mail and wire fraud statutes were limited in scope to the protection of property rights.  The fraud statutes, the Court said, did not authorize federal prosecutors to "set [] standards of disclosure and good government for local and state officials." Id. at 360.  Congress responded to the McNally decision by enacting 18 U.S.C. § 1346.  The vagueness of 18 U.S.C. § 1346, caused the Supreme Court to adopt a "limiting construction," confining the statute to schemes involving bribes or kickbacks.  Skilling v. Unites States, 561 U.S. 358, 405, 410 (2010).  In Skilling, the Court specifically rejected a proposal to construe the statute as encompassing "undisclosed self-dealing by a public official," even when he hid financial interests.  Id. at 409. The upshot is that federal fraud law leaves much public corruption to the States to rectify.[7]

Undaunted by the Supreme Court's clear rejection of an undisclosed self-dealing theory of honest services wire fraud, the government nevertheless alleges in this case that Pullman's undisclosed self-dealing violates 18 U.S.C. §§ 1343 and 1346  Since an undisclosed self-dealing theory cannot be the basis for an honest services fraud prosecution, the Court should dismiss the

---

must prove that (1) she knowingly and willingly participated in a scheme or artifice to defraud; (2) that the scheme included the payment of a bribe or kickback; (3) that she had the specific intent to deprive the alleged victim of its right to honest services; (4) that she had the specific intent to deceive the victim; (5) that her failure to disclose a fact was material; and (6) that she used, or caused someone to use, a wire to carry out or to attempt to carry out the scheme or plan.  See Instructions 4.18.1341, 1343 and 1346, United States District Court District of Maine 2019 Revisions to Pattern Criminal Jury Instructions for the District Courts of the First Circuit; see also Instruction 8.123, Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit (last updated 12/2020).

[7] Unlike a fraud in which a victim's loss of money or property supplies the defendant's gain, with one mirror image of the other, the honest-services theory targets corruption that lacks similar symmetry.  Under the honest-services theory, the offender profits, but the betrayed party suffers no deprivation of money or property; instead, a third party, who was not deceived, provides the enrichment.  For example, if a city mayor (the offender) accepted a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same that could have been negotiated at arm's length, the city (the betrayed party) suffers no tangible loss.  Skilling at 400.

indictment to the extent it alleges this rejected theory.

A.  The Indictment Does Not Allege A Bribery Scheme.

Under current law, honest services fraud criminalizes only schemes to defraud that involve bribery or kickbacks.  Skilling v. Unites States, 561 U.S. 358, 408-09 (2010); Black v. United States, 561 U.S. 465, 471 (2010).  Undisclosed conflicts of interest, or undisclosed self-dealing is not sufficient. Skilling at 409-410.  At present, there is no controlling case law after Skilling that extends honest services fraud to any other circumstance. Id. at 412 ("no other misconduct falls within § 1346's province").

The "prohibition on bribes and kickbacks draws content not only from pre-McNally case law, but also from federal statutes proscribing – and defining – similar crimes."  Id. (citing 18 U.S.C. §§ 201(b) (bribery)[8], 666(a)(2); 41 U.S.C. § 52(2)[9] (kickbacks)); see also McNally (which the Skilling Court called "classic kickback scheme").

The indictment does not allege the elements of the crime of bribery or a bribery scheme. The indictment does not allege any *quid pro quo,* or any official act taken by Pullman in exchange for any payment.  Compare, McDonnell v. United States, 136 S. Ct. 2355 (2016) (To qualify as an "official act," the public official must make a decision or take an action on a question, matter,

---

[8]18 U.S.C. § 201(b) states, in pertinent part: (b)Whoever—(1) directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—(A) to influence any official act; or (B) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or (C) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person.

[9] 41 U.S.C. § 52(2) defines the term "kickback" as:  any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

cause, suit, proceeding or controversy or agree to do so).[10]

B.   The Indictment Does Not Allege A Kickback Scheme.

The indictment does not allege a kickback scheme.  Specifically, the indictment does not allege that Pullman and Lynch agreed, in exchange for Pullman sending or referring work to Lynch's lobbying firm, that she would pay Pullman a share of her firm's fees or profits.  Indeed, the indictment alleges that Lynch and her lobbying firm were working for SPAM before Pullman became president.

As the Court observed in Skilling, the McNally case involved a "classic kickback scheme." In McNally, a public official, in exchange for steering Kentucky's insurance business through a middleman company, arranged for that company to share its commissions with entities in which the official held an interest.  Rejecting the government's argument that McNally involved the "nondisclosure of a conflicting financial interest," the Court noted that McNally was "no mere failure to disclose a conflict of interest; rather, the official conspired with a third party so that both would profit from wealth generated by public contracts."  Skilling, supra at 410.

The indictment in this case does not allege the facts of a classic kickback scheme. Apparently, the government's investigation was unable to present evidence to the grand jury that Pullman and Lynch had any agreement and, more importantly, the terms of any agreement.  As a result, the government has merely alleged that payments were made under unusual circumstances. However, the fact that the payments to Pullman and his spouse were, in each instance, by check,

---

[10] In McConnell v. United States the Supreme Court noted that:

[I]t is apparent from Sun-Diamond that hosting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a 'decision or action' within in the meaning of [the federal bribery statute] even if the event, meeting or speech is related to pending question or matter. Instead, something more is required: [the bribery statute] specifies that the public official must make a decision or take an action *on* that question of matter or agree to do so. Id. at 2370.

makes clear that Lynch did not have any corrupt intent or an intent to deceive.  If she did, she would have paid Pullman in cash.

    C.  <u>Conflict of Interest Cases Are Not "Core" Cases Post-Skilling</u>

The <u>Skilling</u> Court specifically rejected "conflict of interest cases" as a "core applications" of the honest services fraud doctrine.  The Court noted:

> Although the Courts of Appeals upheld honest-services convictions for some schemes of non-disclosure and concealment of material information (citation omitted) they reached no consensus on which schemes qualified.  In light of the infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges, and the intercircuit inconsistencies they produced, we conclude that a reasonable limiting construction of § 1346 must exclude this amorphous category of cases.  <u>Id</u>. at 365.

In this case, there is no allegation in the indictment that Pullman and Lynch conspired to share the profits from SPAM's lobbying work.  Moreover, the indictment does not allege that Lynch paid Pullman money for funneling lobbying work to her Firm.  There are no allegations, either before or after Lynch's lobbying firm's receipt of SPAM's final payment for the DOL Project, that Lynch and Pullman agreed that Pullman would share in the lobbying firm's fees from the DOL Project.  Rather, the indictment points to one payment wherein Lynch paid Pullman's wife $20,000 after the final payment for DOL Project was made to Lynch's lobbying firm.[11]

Lynch submits that a single payment that does not violate state law should not be the basis of an honest services wire fraud charge.  <u>United States v. Brumley</u>, 116 F.3d 728, (5th Cir.) (en banc) <u>cert</u>. <u>denied</u>, 522 U.S. 1028 (1997) (§ 1346 extends only to conduct that independently violates state law); <u>but</u> <u>see</u> United <u>States v. Margiotta</u>, 688 F. 2d 108, 124 (2nd Cir. 1982) (violation of local law is not an essential element…."), <u>cert</u>. <u>denied</u>, 461 U.S. 913 (1983); <u>United States v.</u>

---

[11]The government also alleges that this $20,000.00 payment deprived the Commonwealth of Pullman's honest services.  However, Pullman, as President of SPAM, owed no fiduciary duties to the Commonwealth or MSP.  Indeed, the Commonwealth and MSP were SPAM's adversaries in the DOL grievance.

Keane, 522 F.2d 534, 545 (7th Cir. 1975) cert. denied, 424 U.S. 976 (1976).  The issue is pertinent

here because the government has chosen to proceed on a theory that one undisclosed act of self-

dealing is a federal crime.  See United States v. Urciouli, 513 F.3d 290, 298 (1st Cir. 2008) (just

how far a non-violation of state law immunizes conduct that the government alleges is a federal

crime is a tricky question that depends on precisely what the government has charged).

Moreover, a payment that is unhinged from any official act of the recipient is not illegal

under Massachusetts law.  By way of analogy, the Massachusetts gratuities statute penalizes those

who give illegal gratuities to officials as well as officials who receive illegal gratuities.  A gratuity

may be given as "a reward for past action, to influence an official regarding a present action, or to

induce an official to undertake a future action."  Scaccia v. State Ethics Comm's, 431 Mass. 351.

355 (2000).  However, mere proof of the public official's position is insufficient to demonstrate

an "official act" under the statute: "[t]he insistence upon the 'official act,' carefully defined, seems

pregnant with the requirement that some particular official act be identified and proved." United

States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 406 (1999).  As such, "[t]he government

must 'prove a link between a thing of value conferred upon a public official and a specific 'official

act' for or because of which it was given." Scaccia, supra at 355 (quoting Sun Diamond Growers

of Cal., 526 U.S. at 414).

The government cannot show the requisite linkage if the payment was given "to build a

reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts,

now and in the future."  Sun-Diamond, supra at 405.  Recognizing that direct evidence of these

sorts of violations may be difficult to obtain, the courts accept "evidence regarding the subject

matter of pending legislation and its impact on the giver, the outcome of particular votes, the timing

of the gift, or changes in voting pattern" to demonstrate the requisite linkage.  Scaccia, supra at

357.  The circumstantial evidence in this case does not establish the requisite linkage.

D.  The Allegations In the Indictment Are Insufficient To State An Honest Services Wire
   Fraud Charge After Skilling.

It is practically gospel in the lower courts that the Section 1346 "does not encompass every

instance of official misconduct."  United States v. Sawyer, 85 F.3d 713, 725 (1st Cir. 1996).

> [A]lthough a public official might engage in reprehensible misconduct related to an
> official position, the conviction of that official for honest-services fraud cannot stand
> where the conduct does not actually deprive the public of its right to her honest
> services, and it is not shown to intend that result. Id.

The First Circuit has clearly explained it is not enough for the government to show

wrongdoing; it "must also demonstrate that the wrongdoing at issue is intended to prevent or call into

question the proper or impartial performance of the public servant's official duties."  United States v.

Czubinski, 106 F.3d 1069, 1076 (1st Cir. 1997).

Cognizant of the fact that the "concept of honest services" is vague and undefined by the

statute, courts have carefully limited the official actions that may constitute honest-services fraud.

United States v. Urciuoli, 513 F.3d 290, 294 (1st Cir. 2008).

> [A]s one moves beyond core misconduct covered by the statute (e.g., taking a bribe
> for a legislative vote), difficult questions arise in giving a coherent content to the
> phrase through judicial glosses.  Closely related concerns are assuring fair notice to
> those governed by the statute (citation omitted) and cabining the statute – a serious
> crime with serious penalties – lest it embraces every kind of legal or ethical abuse
> remotely connected to the holding of a governmental position."  Id.

Thus, for the honest-services statute to be triggered, there must be an actual impact on the official's

performance of his duties.

The First Circuit has held that the honest-services statute embraces "formal official action like

votes," "the informal exercise of influence on bills by a legislator," and true acts of "influence-buying"

involving official business. At the same time, the court has strictly policed the line between official

14

actions, which implicate the honest-services statute, and other kinds of less formal or less official conduct, which do not.  See Czubinsky, supra at 1076-77 (IRS employee who accessed confidential computerized tax files in violation of ordinary confidentiality restrictions did not run afoul of the statute); Sawyer, supra at 729 (unlawful gifts fall outside the scope of the statute unless they are specifically "intended to influence or otherwise improperly affect the official's performance of duties."); Urciuoli supra at 299 (what is unlawful under the honest-services statute is for a person to make payments to a public official with the intent to cause that official to act in his official capacity in a way that benefits the person making the payments.).

The First Circuit's limited application of the honest services fraud theory is consistent with other Circuits.  See United States v. McNeive, 536 F.2d 1245, 146 (8th Cir. 1976)  (city plumbing inspector who repeatedly accepted unsolicited gratuities in connection with his non-discretionary, administrative duty to issue plumbing permits likely violated a city ordinance banning the acceptance of gratuities by city officials was beyond the reach of the mail fraud statute because there was no evidence that the gratuities disadvantaged the city in any respect or that they deterred him from otherwise conscientiously performing his duties); United States v. Rabbit, 583 F.2d 1014, 1026 (8th Cir. 1978) cert. denied, 439 U.S. 1116 (1979) (state representative, who introduced a friend's architectural firm to the public officials responsible for awarding state architectural contracts, in exchange for a ten percent commission on any work awarded, did not establish the substantive offense of mail fraud.).

The McNeive and Rabbit cases illustrate that even where a public official engages in reprehensible misconduct related to his official position, the conviction of that official for honest-services fraud cannot stand when the conduct does not actually deprive the public of its right to honest services, or it is not shown to intend that result.  Sawyer, supra at 725.  Similarly, if a non-public

official like Lynch is prosecuted for scheming to defraud the public of an official's honest services, the government must prove that the "target" of her scheme was the deprivation of the official's honest services.  If the "scheme" does not, as its necessary outcome, deprive the public of honest services, then independent evidence of the intent to deprive another of those services must be presented.  See United States v. D'Amato, 39 F.3d 1249, 1257 (2nd Cir. 1994) ("Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent."); United States v. Von Barta, 635 F.2d 999, 1005-1006 n.14 (2d Cir. 1980) (noting that "the prosecution must prove that some actual harm or injury was at least contemplated"), cert. denied, 450 U.S. 998 (1981); Compare, United States v. Harvey, 532  F.3d 326, 335  (a bribery-like, corrupt intent to influence official action necessarily is an intent to deprive the public of an official's honest services).   Post-Skilling, the government's proof of Lynch's intent to deprive SPAM, the Commonwealth or MSP of Pullman's honest services is paramount.

In the present case, the indictment does not allege the payments received by Pullman's spouse impacted Pullman's his decision-making or the performance of his duties.  Moreover, the indictment does not allege that the target of the scheme was Pullman's honest services.  Finally, the indictment does not allege that Pullman's receipt of a single payment caused him to do anything in breach of the fiduciary duties he owed to MSP or SPAM.  In short, where the indictment does not allege that Pullman's honest services were the target of the scheme or that the scheme caused him to take some official act to the detriment of MSP or SPAM, it should not survive post-Skilling.

In sum, because the indictment alleges only one instance of undisclosed self-dealing which does not violate state law and which is outside the post-Skilling core of bribery and kickback cases,

the indictment does not allege an honest services wire fraud crime.  Accordingly, all references to honest services fraud contained in the indictment should be stricken.

IV.     THE INDICTMENT DOES NOT ALLEGE A WIRE FRAUD CRIME.

The federal wire fraud statute makes it a crime to effect (with use of the wires) "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343; Kelly v. United States, 140 S. Ct. 1565, 1567 (2020).  Construing that disjunctive language as a unitary whole, the Supreme Court has held that "money-or-property requirement of the latter phrase" also limits the former.  Id. citing McNally, supra at 358.  The wire fraud statute thus prohibits only deceptive "schemes to deprive [the victim of] money or property."  Id.  Thus, under either provision, the government must prove not only that Pullman and Lynch engaged in deception, but that the "object of the[ir] fraud [was] 'property.'"  Id. (citing Cleveland v. United States, 531 U.S. 12, 26 (2000).[12]  This requirement, the Courts have made clear, prevents the wire fraud statute from criminalizing all acts of dishonesty by state and local officials.

In the present case, the government is essentially alleging that Pullman and Lynch devised a scheme to deprive Company A and Company B of its money by Pullman recommending Lynch's lobbying firm to assist them.  There is no allegation that the lobbying firm did not provide the services promised.  There is no allegation that Company A or Company B overpaid for the lobbying firm.  There is not even an allegation that Lynch paid Pullman with Company A or B's money.  There is no allegation that either Lynch or Pullman made any affirmative misrepresentations of fact to Company A or B.  There is no allegation that either Pullman or Lynch had a fiduciary duty to disclose the payments Lynch paid to Company A and B.  Rather, the

---

[12] The conspiracy counts raise no separate issue.  If there is property fraud, there would also be a conspiracy to commit it.  But if not, then not.

indictment alleges that Lynch and Pullman committed wire fraud merely by failing to disclose that Lynch paid Pullman after Pullman referred business to her lobbying firm.

A.  The Indictment Does Not Allege Any Affirmative Misrepresentations.

In order for a defendant to be found guilty of wire fraud, the government must prove that defendant knowingly and willfully participate in a scheme for obtaining money or property by means of false pretenses, representations or promises.  Knowingly and willfully means that the government must prove that defendant acted with knowledge that his conduct was unlawful. Russell v United States, 134 S. Ct. 1872 (2014). Bryan v. United States, 524 U.S. 184, 191-92 (1998).  Deceitful statements of half-truths may constitute false or fraudulent representations. However, in this case, the indictment does not allege any false statements or false half-truths.

B.  The Indictment Does Not Allege Any Duty to Disclose An Omitted Fact Arising Out of A Relationship Of Trust Or That Defendant Omitted A Fact With Knowledge That Her Conduct Was Unlawful.

Assuming that the government's wire fraud theory concerning Company A and B is based on defendants' failure to disclose the payments Lynch made to Pullman, the indictment does not allege any duty by either Pullman or Lynch to disclose this fact.  Indeed, the indictment does not allege any formal fiduciary relationship or an informal trusting relationship which gives rise to a duty of disclosure.  United States v. Milovanovic, 678 F.3d 713, 721 (9th Cir. 2012) (en banc).  The mere fact that Lynch had a business relationship with Company A and B does not mean that she owed a fiduciary duty to either company.  Id. at 722 (courts must carefully distinguish between arms-length commercial relationships where trust is created by a defendant's personality or the victim's credulity and relationships in which the victim's trust is based on defendant's position in the transaction). Moreover, there are no allegations that Lynch agreed to any fiduciary relationship with Company A or B or SPAM for that matter.  Finally, there are no allegations that she knew

that she had a duty to disclose at the time of her omission or that she knew that her failure to disclose was unlawful at the time of her omission.

Because the indictment does not allege a wire fraud crime involving Company A or B, Counts V-VII in the indictment should be stricken.

V.  IF THE COURT DECIDES THAT THE INDICTMENT SUFFICIENTLY ALLEGES AN HONEST SERVICES CHARGE, THEN 18 U.S.C. § 1346 IS VAGUE AS APPLIED IN THIS CASE.

A criminal statute must clearly define the conduct it proscribes, see Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). A statute that is unconstitutionally vague cannot be saved by a more precise indictment. See Lanzetta v. New Jersey, 306 U.S. 451, 453 (1939).

A criminal statute may be invalidated on vagueness grounds because (1) it fails to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits, or because (2) it authorizes and even encourages arbitrary and discriminatory enforcement. City of Chicago v. Morales, 527 U.S. 41, 56 (1999), citing Kolender v. Lawson, 461 U.S. 352, 357 (1983). Moreover, the rule of lenity requires that any ambiguities be resolved in favor of narrowing rather than expanding the questioned language. See e.g., Cleveland v. United States, 531 U.S. 12, 25 (2000) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity") quoting Rewis v. United States, 401 U.S. 808, 812 (1971). Lynch submits that § 1346 did not provide her with fair notice that her conduct was unlawful, and the statute's vagueness encourages arbitrary enforcement because it does not define the honest services it prohibits.

A.  The Skilling Court's Limitation Of The Honest Services Fraud Doctrine To Bribery and Kickback Schemes Does Not Save The Statute From A Vagueness Challenge.

The Skilling Court defined "the intangible right of honest services" to mean the right not to have one's fiduciaries accept "bribes or kickbacks." Nevertheless, the statute still provides no "ascertainable standard of guilt," United States v. L. Cohen Grocery Co., 255 U.S. 81, 89 (1921).

19

The <u>Skilling</u> Court reached this definition by claiming that the pre-<u>McNally</u> honest services doctrine had, at its core, bribery and kickback cases.  However, the <u>McNally</u> Court did not limit the theory it rejected to bribery and kickback cases. Rather, the <u>McNally</u> Court referred to the broader rights of citizens "to have the [State]'s affairs conducted honestly," <u>id</u>., at 353, to "honest and impartial government," <u>id</u>., at 355, to "good government," <u>id</u>., at 356, and "to have public officials perform their duties honestly," <u>id</u>., at 358. Thus, the <u>McNally</u> Court described prior case law as holding that "a public official owes a fiduciary duty to the public, and misuse of his office for private gain is a fraud," <u>Id</u>.  at 355.

Moreover, the pre-<u>McNally</u> Court of Appeals opinions were not limited to fraud by public officials. Some courts had held that those fiduciaries subject to the "honest services" obligation included private individuals who merely participated in public decisions, <u>see</u>, <u>e.g.</u>, <u>United States v. Gray</u>, 790 F.2d 1290, 1295-1296 (6th Cir.1986)  (<u>per curiam</u>) (citing <u>United States v. Margiotta</u>, 688 F.2d 108, 122 (2nd Cir.1982)), and even private employees who had no role in public decisions, <u>see</u>  <u>United States v. Lemire</u>, 720 F.2d 1327, 1335-1336 (DC Cir. 1983); <u>United States v. Von Barta</u>, 635 F.2d 999, 1007 (2nd Cir. 1980).

Moreover, as Justice Scalia correctly observed in his concurrence in <u>Skilling</u>, "to say that a man is a fiduciary only begins [the] analysis; it gives direction to further inquiry. . . . What obligations does he owe as a fiduciary?" <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 85-86 (1943). "Unfortunately, none of the 'honest services' cases, neither those pertaining to public officials nor those pertaining to private employees, have defined the nature and content of the fiduciary duty central to this 'fraud' offense." <u>Skilling</u>, <u>supra</u> at 417 (Scalia, J. concurring)

Indeed, prior to <u>McNally</u>, there was not agreement concerning the source of the fiduciary obligation, to wit, whether it must be positive state law or positive federal law, <u>see</u>, <u>United States</u>

v. Rabbitt, 583 F.2d 1014, 1026 (8th Cir. 1978), or merely general principles, such as the "obligations of loyalty and fidelity" that inhere in the "employment relationship," Lemire, supra, at 1336.

For example, the decision that McNally reversed grounded this fiduciary duty in general trust law, see Gray, supra at 1294. Another pre-McNally case referred to the general law of agency, United States v. Ballard, 663 F.2d 534, 543, n. 22 (5th Cir. 1981), modified on other grounds by 680 F.2d 352 (1982), which imposes duties quite different from those of a trustee. Moreover, the uncertainty regarding the source of the fiduciary obligation owed under § 1346 does not disappear if one assumes that the pre-McNally cases developed a federal, common-law fiduciary duty because the duty remains undefined.

Some courts have described the duty in broad terms. See Blachly v. United States, 380 F.2d 665, 671 (5th Cir. 1967) (where the court declared that "[l]aw puts its imprimatur on the accepted moral standards and condemns conduct which fails to match the `reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" (quoting Gregory v. United States, 253 F.2d 104, 109 (5th Cir. 1958)). Other courts expanded the definition to any scheme "contrary to public policy." See United States v. Bohonus, 628 F.2d 1167, 1171 (9th Cir. 1980).

Even opinions that did not indulge in such grandiose terms did not specify the specific duty at issue beyond loyalty or honesty, see, e.g., Von Barta, supra, at 1005-1006. Moreover, the demands of the duty were said to be greater for public officials than for private employees, see, e.g., Lemire, supra, at 1337, n. 13; Ballard, supra, at 541, n. 17, but in what way neither Congress nor the courts have told persons of ordinary intelligence.

Moreover, the indefiniteness of the fiduciary duty owed is not the only problem with the honest services fraud theory.  Many courts have held that something more than a mere breach of fiduciary duty is needed to establish honest-services fraud.  <u>See</u>, <u>Von Barta</u>, <u>supra</u>, at 1006 (collecting cases); <u>United States v. George</u>, 477 F.2d 508, 512 (7th Cir. 1973). However, there was some dispute about this "something else" pre-<u>McNally</u>, at least in the context of acts by public officials. <u>See</u> <u>United States v. Price</u>, 788 F.2d 234, 237 (4th Cir. 1986).

Even among the courts that did require "something else" when a public official was involved, there was disagreement as to what this "something else" should be. <u>See</u> <u>United States v. Bush</u>, 522 F.2d 641, 647-48 (1975) (where Seventh Circuit held that material misrepresentations and active concealment were enough); <u>compare</u> <u>Rabbitt</u>, <u>supra</u> at 1026 (where Eighth Circuit held that actual harm to the State was needed).

Pre-<u>McNally</u>, similar disagreements occurred with respect to private employees. Courts disputed whether the defendant must use his fiduciary position for his own gain. <u>Compare</u> <u>Lemire</u>, <u>supra</u>, at 1335 (yes), with <u>United States v. Bronston</u>, 658 F.2d 920, 926 (2d Cir. 1981) (no). The Seventh Circuit upheld a mail-fraud conviction on the ground that the defendant's "failure to disclose his receipt of kickbacks and consulting fees from [his employer's] suppliers resulted in a breach of his fiduciary duties depriving his employer of his loyal and honest services." <u>United States v. Bryza</u>, 522 F.2d 414, 422 (7th Cir. 1975).

However, another opinion demanded more than an intentional failure to disclose: "There must be a failure to disclose something which in the knowledge or contemplation of the employee poses an independent business risk to the employer." <u>Lemire</u>, 720 F.2d, at 1337. Other courts required that the victim suffer some loss, <u>see</u> <u>Ballard</u>, <u>supra</u>, at 541-542.  And, of course, other

courts rejected this limitation.   See United States v. Newman, 664 F.2d 12, 20 (2nd Cir. 1981); United States v. O'Malley, 535 F.2d 589, 592 (10th Cir. 1976).

As a result, the pre-McNally case law provided no clear indication of what constitutes a denial of the right of honest services. As Justice Scalia pointedly noted in Skilling:

> The possibilities range from any action that is contrary to public policy or otherwise immoral, to only the disloyalty of a public official or employee to his principal, to only the secret use of a perpetrator's position of trust in order to harm whomever he is beholden to. The duty probably did not have to be rooted in state law, but maybe it did. It might have been more demanding in the case of public officials, but perhaps not. At the time § 1346 was enacted there was no settled criterion for choosing among these options, for conclusively settling what was in and what was out. Skilling supra at 2938 (Scalia, J. concurring).

Moreover, the Skilling Court's narrowing of the honest service fraud doctrine to bribery and kickback scheme does not eliminate the vagueness of the statute. Also, as Justice Scalia observed in his concurrence, limiting § 1346 to bribery and kickback schemes does not:

> [S]olve the most fundamental indeterminacy: the character of the "fiduciary capacity" to which the bribery and kickback restriction applies. Does it apply only to public officials? Or in addition to private individuals who contract with the public? Or to everyone, including the corporate officer here? The pre-McNally case law does not provide an answer. Thus, even with the bribery and kickback limitation the statute does not answer the question, "What is the criterion of guilt?
>
> But that is perhaps beside the point, because it is obvious that mere prohibition of bribery and kickbacks was not the intent of the statute. To say that bribery and kickbacks represented "the core" of the doctrine, or that most cases applying the doctrine involved those offenses, is not to say that they *are* the doctrine. All it proves is that the multifarious versions of the doctrine *overlap* with regard to those offenses. But the doctrine itself is much more. Among all the pre-McNally smorgasbord offerings of varieties of honest-services fraud, *not one* is limited to bribery and kickbacks. That is a dish the Court has cooked up all on its own. (emphasis in original).   Skilling supra at 2938 (Scalia, J. concurring).

Thus, while it is clear that Congress meant to reinstate the body of pre-McNally honest-services law and that Congress intended § 1346 to reach at least bribes and kickbacks, it is not clear whether § 1346 criminalizes only bribery and kickbacks after Skilling.

B.  The <u>Skilling</u> Decision Was Wrongly Decided Because The Court Legislated A New Federal Law To Avoid A Finding That § 1346 is Vague On Its Face

The <u>Skilling</u> Court's majority opinion was wrongly decided because the majority legislated a new federal law to avoid a vagueness challenge.  Indeed, no court before <u>McNally</u> concluded that a "deprivation of honest services" meant only the acceptance of bribes or kickbacks. Moreover, it is clear that Congress, when passing § 1346, enacted the entirety of pre-<u>McNally</u> honest services law.  Indeed, it is also clear that the pre-<u>McNally</u> honest services case law was not limited to only bribes or kickbacks.

As discussed above, courts have debated what categories of conduct falls within the "core" of § 1346.  However, there is no agreement on the scope or boundaries of those categories.  There is even disagreement over whether a factor as fundamental as "personal gain" is a necessary element of the crime.  <u>Compare</u> <u>United States v. Bloom</u>, 149 F.3d 649, 656-67 (7th Cir. 1998), with <u>United States v. Panarella</u>, 277 F.3d 678, 691-92 (3d Cir. 2002), <u>cert. denied</u>, 537 U.S. 819 (2002).

As noted in a well-reasoned dissenting opinion from the Fifth Circuit, the phrase "intangible right of honest services" utterly lacks and actually defines a precise definition.  Honest services "is not defined anywhere in the United States Code, is not defined in BLACK'S LAW DICTIONARY, and has never been used in the United States Code prior to its use in § 1346." <u>United States v. Brumley</u>, 116 F.3d 728, 742 (5th Cir. 1997) (Jolly, DeMoss & Smith, JJ., dissenting) <u>cert</u>. <u>denied</u>, 522 U.S. 1028 (1997).  Just as obvious is the fact that the term "intangible right" lacks definition by its very nature.  <u>Id</u>.   Numerous courts, including the First Circuit, have expressed a similar displeasure with the statute's ambiguity.  <u>See</u> <u>e.g.</u>, <u>Sawyer</u> <u>supra</u> at 724 (noting the concept "honest services" eludes easy definition); <u>United States v. Rybicki</u>, 354 F.3d 124, 136 (2nd Cir. 2003) (en banc), <u>cert</u>. <u>denied</u>, 125 S. Ct. 32 (2004);  (court would have to "labor long and with difficulty in seeking a clear and properly limited meaning of 'scheme or artifice to deprive

another of the intangible right of honest services' simply by consulting a dictionary for the literal, 'plain' meaning of the phrase."); United States v. Martin, 195 F.3d 961, 967 (7th Cir. 1999) cert. denied, 541 U.S. 1072 (2004) (noting the persistent concerns about breadth and vagueness).

Finally, "[h]ow can the public be expected to know what the statute means when the judges and prosecutors themselves do not know, or must make it up at they go along?" Rybicki, supra at 160 (Jacobs, J. dissenting).

C. Section 1346 Permits And Encourages Arbitrary Enforcement.

Section 1346 also fails the second part of the Kolender v. Lawson test, which requires a statute to establish "minimal guidelines to govern law enforcement." Kolender supra at 358. As the Rybicki dissent notes, there are no standards in the statute or the case law to guide prosecutors or to prevent the criminalization of a wide range of common conduct. More importantly, there is disagreement among the appellate courts on such basic questions as (1) the requisite *mens rea* to commit the crime; (2) whether the defendant must cause actual tangible harm; (3) the duty that must be breached; (4) the source of that duty; and (5) which body of law informs us of the statute's meaning. Id. at 163 (Jacobs, J. dissenting). This lack of coherence has created "a truly extraordinary statute in which the substantive force of the statute va[ries] in each judicial district." Id. at 163 quoting Brumley, supra at 743 n. 6 (Jolly, J. dissenting). All these unresolved issues, and the doubts surrounding them, permit prosecutors to simply pick and choose when an honest services fraud charge is appropriate. However, what is clear is that a statute that allows its essential elements to be debated by courts and ignored by prosecutors is the very essence of a statute that permits and encourages arbitrary enforcement.

Section 1346 is nothing more than an open invitation for federal courts to develop a common law crime of ethical conduct. However, the "notion of a common-law crime is utterly

anathema today" and for good reason.  Rogers v. Tennessee, 532 U.S. 451, 476 (2001) (Scalia, J. dissenting).  As courts have long explained, there is simply no such animal as a common law crime. See, e.g., United States v. Hudson & Goodwin, 11 U.S. (7 Cranch) 32 (1812).  Nevertheless, Lynch submits that the vague and ambiguous language chosen by Congress when enacting § 1346 effectively creates one.

When the McNally Court ended the judicially created "intangible right to honest services" language that the courts had grafted onto the mail fraud and wire fraud statutes, Congress codified the judicially created rule by enacting § 1346 with its "intangible right to honest services" language.  The problem with this approach is that it once again invites courts (and prosecutors) to create a common law crime of honest services fraud as they go.  This approach, if left unchecked, will result in an ever-evolving impermissible common law crime.

The lengthy and varied list of elements and parameters applicable to honest-services fraud that has been developed by the various courts illustrate its vagueness.  Recognizing that Congress, and not the courts, must define criminal activity, the Rybicki dissent concluded that § 1346 was a prime example of a statute that impermissibly required judicial lawmaking:

> … the vagueness of the statute has induced court after court to undertake a rescue operation by fashioning something that (if enacted) would withstand a vagueness challenge.  The felt need to do that attests to the constitutional weakness of section 1346 as written.  And the result of all these efforts – which has been to create different prohibitions and offenses in different circuits – confirms the weakness is fatal.  Judicial invention cannot save a statute from unconstitutional vagueness; courts should not try to fill out a statute that makes it an offense to "intentionally cause harm to another," or to "stray from the straight and narrow," or to fail to render "honest services."

Id. at 163-164.  See also Brown, supra at 534 (DeMoss, J., concurring in part and dissenting in part) (the lack of clarity in Section 1346 has caused the courts to do "precisely what most would say we lack the constitutional power to do, that is, define what constitutes criminal conduct on an

*ex post facto* and *ad hoc* basis."). As highlighted by Justice Scalia in his concurrence in <u>Skilling</u>, judicial lawmaking was the result of the majority opinion in <u>Skilling</u>.

Accordingly, Lynch respectfully submits that the Court should find that the honest services statute is unconstitutionally vague on its face.

D. <u>18 U.S.C. § 1346 Is Unconstitutionally Vague As Applied To The Facts In This Case.</u>

Should this Court decide that § 1346 is not unconstitutionally vague on its face, Lynch further submits that it is unconstitutional as applied to the facts of her case. Indeed, there is no reasonable argument that Lynch was put on notice that her alleged conduct could be deemed to be a crime under the honest-services statute. As noted above, Lynch's conduct does not fall within the core applications of the honest-services statute as defined by the courts. The indictment also does not allege a typical self-dealing scenario where a defendant typically causes his employer to do business with a corporation or entity in which the defendant has a secret, undisclosed, ownership interest. Also, there are no allegations in the indictment that Pullman's recommendation was not warranted. Even more importantly, there are no facts alleged in the indictment that Lynch's lobbying firm was not qualified to perform the contracts it had with SPAM, Company A and Company B.

Finally, with respect to the money that Lynch gave to Pullman (or his spouse), there is nothing alleged in the indictment to infer that these payments had any relationship to Pullman's official duties or actions. And, perhaps more importantly, there are no allegations that would give rise to the inference that Pullman gave Lynch or her Lobbying Firm any special treatment as a result of receiving these payments. Under these circumstances, there is simply nothing in § 1346 or its progeny that would have put Lynch on notice that her conduct fell within the statute's scope. Similarly, nothing in § 1346 provides the U.S. Attorney's Office with even minimal guidance as

to whether Lynch's conduct is the proper subject of this federal honest services wire fraud prosecution.  "It is simply not fair to prosecute someone for a crime that has not been defined until the judicial decision that sends him to jail."  <u>Sorich v. United States</u>, 129 S. Ct. 1308, 1310 (Scalia, J. dissenting).  As such, § 1346 falls far short of the requirements of due process as applied to the facts of this case.

CONCLUSION

For all of the above reasons, defendant Anne M. Lynch respectfully submits that this Honorable Court to dismiss Count III alleging conspiracy to commit honest services wire fraud and wire fraud, Count IV alleging honest services wire fraud and aiding and abetting, Counts V, VI and VII alleging wire fraud and aiding and abetting, a partial dismissal of Count I to the extent it alleges the conspiracy included honest services wire fraud, wire fraud, aiding and abetting honest services wire fraud and commercial bribery and Count II to the extent it alleges the racketeering enterprise's predicate acts included the crimes of honest services wire fraud, wire fraud, aiding abetting honest services wire fraud, and commercial bribery.

> Respectfully submitted,
> For Anne M. Lynch
> By her attorneys,
> LAWSON & WEITZEN, LLP
>
>
>   /s/   Scott P. Lopez
> Scott P. Lopez, BBO # 549556
> Lawson & Weitzen, LLP
> 88 Black Falcon Ave., Suite 345
> Boston, MA  02210
> (617) 439-4990 (tel)
> (617) 439-3987 (fax)
> splopez@lawson-weitzen.com

<u>Dated</u>:  April 5, 2021

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 5, 2021.

                                     /s/ Scott P. Lopez
                                    Scott P. Lopez